**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5389-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROBERT BELL, a/k/a SHABAZZ
HAKIM, BELL JAY and SHABAZZ H,

    Defendant-Appellant.

_____

Submitted May 15, 2018 — Decided August 3, 2018

Before Judges Yannotti, Carroll, and
DeAlmeida.

On appeal from Superior Court of New Jersey,
Law Division, Gloucester County, Indictment
No. 13-01-0004.

Joseph E. Krakora, Public Defender, attorney
for appellant (Michele E. Friedman, Assistant
Deputy Public Defender, of counsel and on the
briefs).

Gurbir S. Grewal, Attorney General, attorney
for respondent (Sarah D. Brigham, Deputy
Attorney General, of counsel and on the
brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Robert Bell appeals his June 20, 2016 judgment of conviction and sentence for the first-degree attempted murder of Joseph Battle, and related charges. We affirm.

I.

The following facts are derived from the record. On July 26, 2012, defendant and the victim were at a party at a house in Franklinville. Defendant's girlfriend, Dorothea Withers, who is also the victim's sister, was present. Other members of the victim's family were also party guests: Denise Battle and Joann Rankin, two of his sisters; Daniesha Battle, his niece; and Jonathan Battle, his nephew. Brooke Hansen, in whom the victim had a romantic interest, was also present.

Dorothea[1] started a fight with Brooke over a debt that Brooke owed defendant. At the time, the victim and Brooke were sitting in Brooke's car. After a stick or bat broke the car window, Brooke asked the victim to exit the vehicle. She then left the party.

About forty-five minutes later, defendant and the victim engaged in a verbal dispute related to the previous incident. The argument escalated into a physical altercation between the two men, who engaged in fisticuffs, and fell to the ground wrestling.

---

[1] Because the victim and some witnesses share the same last name we refer to the parties by their first names. No disrespect is intended.

Joann, Denise, and Jonathan broke up the fight, physically separating the men. Jonathan pulled the victim off defendant and told him to "leave that man alone and go home." He also pushed defendant away from the victim and told him to "leave that dumb shit alone." Once the men were separated, Denise told the victim to go into the house, and defendant to go in a different direction.

Although the two were still exchanging words, the victim began walking away from defendant. As the victim was about to enter the house, defendant said "I'm going to shoot you," and reached into his pocket as if he were retrieving a gun. Denise testified that at that time she heard other guests at the party say, "he's about to shoot."

The gun was not fully visible because it was wrapped in a bag, rag, or sock. Denise, however, saw its wooden handle. She also saw defendant "fiddle" underneath the material hiding the weapon. Dorothea testified that she saw defendant with a sock, which she told police might have contained a gun. She had previously seen defendant in possession of a handgun.

Defendant pointed the gun at the victim's stomach and pulled the trigger. The gun clicked, but no shot fired. Defendant pulled the trigger a second time, shooting the victim in the right leg, as the victim was in the doorway trying to enter the house.

3

After the shooting, defendant told Dorothea to "come on" and "get [him] the hell out of there." Dorothea and defendant left in her car with Jonathan running after them.

At about that time, Sergeant James Reilly of the Franklin Township Police Department was arriving at a home near the location of the party on an unrelated call. As he arrived, the homeowner told Reilly he had heard gunshots. The officer then received a radio dispatch of a reported gunshot victim at the party. Reilly observed Dorothea's car speed past him, but headed to the party to provide aid to the victim. Before the officer reached the scene of the shooting, Jonathan approached his patrol car and said that the shooter was in the car that had passed the officer.

Reilly pursued Dorothea's vehicle and stopped it nearby. Defendant exited the vehicle and ran into the woods before he could be detained by the officer. His flight was recorded on the patrol vehicle's video recorder. Police were unable to apprehend defendant that evening.

The victim was treated by medical personnel and transported to a local hospital. Detective John Petroski of the Gloucester County Prosecutor's Office met with the victim at the hospital approximately two hours and forty-five minutes after the shooting. The victim, who was in a bed being treated by medical personnel, was largely uncooperative, stating that he wanted to "take care"

of the shooter himself. He did, however, tell the officer that the shooter was his "brother-in-law" with whom he lives. The detective made an audio recording of the victim's interview.

After interviewing the victim, Petroski went to police headquarters to interview witnesses. Denise, Joann, Jonathan, Daniesha, and Dorothea all identified defendant as the shooter.

With information provided by these witnesses, police traced a cellphone believed to be in defendant's possession to a motel in the area of the shooting. Although defendant was not present when an investigating officer arrived, the officer testified that he reviewed a motel surveillance video on which he saw a man enter the motel lobby and secure a room key. The officer testified that the man in the video resembled a composite sketch of defendant given to him by another officer.

Five days after the shooting, defendant was apprehended at a hotel in Philadelphia. At the time of his arrest, defendant had scrapes and marks, particularly on his upper body, consistent with having recently run through brush or sticker bushes.

A grand jury indicted defendant for: first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); second-degree aggravated assault causing serious

bodily injury, N.J.S.A. 2C:12-1(b)(1); third-degree aggravated assault causing bodily injury with a deadly weapon, N.J.S.A. 2C:12-1(b)(2); fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1).

At trial, five eyewitnesses identified defendant as the shooter. The victim, on the other hand, testified that although he and defendant had a physical altercation at the party, they went their separate ways after the fight broke up. He testified that he did not know who shot him, and denied having told the detectives that his brother-in-law shot him.

Defendant did not testify. In summation, his counsel argued that defendant did not shoot the victim, and that another, unidentified guest at the party fired the shot, and left before the police arrived. Counsel claimed that defendant coincidentally left the party with Dorothea just after the shooting.

After a ten-day trial, a jury convicted defendant of all charges. On May 2, 2016, the State moved for an extended term based on defendant's status as a persistent offender under N.J.S.A. 2C:44-3(a). The trial court granted the motion, and sentenced defendant to an extended term of thirty years imprisonment, with an eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, for first-degree

attempted murder. This sentence is to run concurrent with a term of ten years imprisonment, with a five-year period of parole ineligibility for second-degree unlawful possession of a firearm. The court imposed a consecutive ten-year term of imprisonment, with a five-year period of parole ineligibility on the certain-persons conviction. The remaining counts were merged into the attempted murder conviction. Defendant, therefore, received an aggregate term of forty years of imprisonment, with a parole ineligibility period of thirty years and six months.

This appeal followed. Before us, defendant, in a brief filed by counsel, raises the following points:

> POINT I
>
> THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO CHARGE THE JURY ON THE LESSER-INCLUDED OFFENSE OF ATTEMPTED PASSION/ PROVOCATION MANSLAUGHTER. (NOT RAISED BELOW).
>
> POINT II
>
> WHEN ISSUING THE JURY CHARGE FOR POSSESSION OF A FIREARM FOR AN UNLAWFUL PURPOSE, THE COURT REFUSED TO PROVIDE THE JURY WITH THE PORTION OF THE MODEL CHARGE EXPLAINING THE DEFENSE, MERELY BECAUSE THE DEFENDANT DID NOT TESTIFY.
>
> POINT III
>
> THE STATE IMPROPERLY INTRODUCED THE VICTIM'S STATEMENT ON REDIRECT EXAMINATION.

POINT IV

THE ADMISSION OF JONATHAN'S STATEMENT PURSUANT TO N.J.R.E. 803(c)(5) VIOLATED ROBERT'S CONFRONTATION CLAUSE RIGHTS.

POINT V

WHEN ISSUING INSTRUCTIONS AT THE CERTAIN PERSONS TRIAL, THE TRIAL COURT REPEATEDLY REFERENCED THE UNSANITIZED DETAILS OF ROBERT'S PRIOR CONVICTIONS, THEREBY DEPRIVING HIM OF A FAIR TRIAL. (PARTIALLY RAISED BELOW).

POINT VI

THIS COURT SHOULD REMAND THE MATTER FOR RESENTENCING BECAUSE THE SENTENCING COURT ACCORDED UNDUE WEIGHT TO ROBERT'S RECORD, ERRONEOUSLY IMPOSED CONSECUTIVE SENTENCES ON THE ATTEMPTED MURDER AND CERTAIN PERSONS OFFENSES, AND IMPROPERLY CONSIDERED ROBERT'S REFUSAL TO ACKNOWLEDGE GUILT.

In a supplemental pro se brief, defendant raises the following arguments:

POINT I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO CHARGE THE JURY ON THE LESSER-INCLUDED OFFENSE OF ATTEMPTED PASSION/PROVOCATION MANSLAUGHTER, THIS DEPRIVED APPELLANT OF A FAIR TRIAL AND DUE PROCESS OF LAW. U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART I, PARAS. I, 10.

POINT II

WHEN ISSUING THE JURY CHARGE FOR POSSESSION OF A FIREARM FOR AN UNLAWFUL PURPOSE, THE TRIAL COURT REFUSED TO PROVIDE THE JURY WITH THE PORTION OF THE MODEL CHARGE EXPLAINING THE DEFENSE, MERELY BECAUSE THE DEFENDANT DID NOT TESTIFY. THIS VIOLATED APPELLANT'S RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW. U.S. CONST. AMENDS. VI, V, XVI; N.J. CONST. ART I, ¶ I, 9, 10.

POINT III

THE TRIAL COURT FAILED TO GIVE THE JURY INSTRUCTION THAT INTOXICATION IS A DEFENSE TO ALL OF THE COUNTS IN THE INDICTMENT, THIS DEPRIVED DEFENDANT OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, REQUIRING REVERSAL. (NOT RAISED BELOW).

POINT IV

THE LAY OPINION TESTIMONY OF LAW-ENFORCEMENT WITNESSES ABOUT WHAT THEY BELIEVED THEY SAW ON THE SURVEILLANCE VIDEO [DEPRIVED] DEFENDANT OF A FAIR TRIAL.[2]

POINT V

THE TRIAL COURT ERRED IN NOT GRANTING DEFENDANT-PETITIONER['S] MOTION FOR A NEW TRIAL ON THE GROUNDS THAT THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

POINT VI

THE PROSECUTOR'S OFFICE VIOLATED ITS POST-INDICTMENT DISCOVERY OBLIGATIONS UNDER RULE 3:13-3, WHEN ITS INVESTIGATOR DESTROYED HIS INVESTIGATION NOTES. (NOT RAISED BELOW).

---

[2] Brackets in original.

A-5389-15T2

POINT VII

THE TRIAL COURT ABUSED HIS DISCRETION BY USING
FACTS TO SENTENCE DEFENDANT THAT WERE NEVER
PRESENTED TO THE JURY.

POINT VIII

THE CUMULATIVE EFFECT OF THE ERRORS COMPLAINED
OF RENDERED THE TRIAL UNFAIR.

Having considered these arguments in light of the record and applicable legal standards, we affirm.

## II.

We address defendant's arguments in turn.

1. <u>Jury Instruction on Attempted
Passion/Provocation Manslaughter.</u>

Defendant argues that the evidence presented at trial clearly indicated that he could have been convicted of attempted passion/provocation manslaughter, which is a lesser-included offense to attempted murder. He argues that the trial court was obligated to sua sponte instruct the jury on this lesser-included offense despite defendant's failure to request the instruction. We disagree.

It is well-settled that "[a]ccurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." <u>State v. Concepcion</u>, 111 N.J. 373, 379 (1988). However, "[i]f the defendant does not object to the charge at the time it is given, there is a presumption that the charge

was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012).

Therefore, "the failure to object to a jury instruction requires review under the plain error standard." State v. Wakefield, 190 N.J. 397, 473 (2007).

> As applied to a jury instruction, plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).]

The mere possibility of an unjust result is not enough to warrant reversal of a conviction. State v. Jordon, 147 N.J. 409, 422 (1997). The error "must be evaluated in light of the overall strength of the State's case." State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289).

The trial court's decision to charge on a lesser-included offense is governed by N.J.S.A. 2C:1-8(e). Under the statute, the trial court cannot charge a jury on "an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8(e). "[A] trial court has an independent obligation to instruct on lesser-included

charges when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." State v. Jenkins, 178 N.J. 347, 361 (2004) (citing State v. Garron, 177 N.J. 147, 180 (2003)). However, "when the defendant fails to ask for a charge on lesser-included offenses, the court is not obliged to sift meticulously through the record in search of any combination of facts supporting a lesser-included charge." State v. Denofa, 187 N.J. 24, 42 (2006). "[T]he need for the charge must 'jump off' the proverbial page." State v. R.T., 205 N.J. 493, 510 (2011).

"Passion/provocation manslaughter is an intentional homicide committed under extenuating circumstances that mitigate the murder." State v. Robinson, 136 N.J. 476, 481 (1994). A criminal homicide may be considered manslaughter when "[a] homicide which would otherwise be murder under section 2C:11-3 is committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). "Thus, passion/provocation manslaughter is considered a lesser-included offense of murder: the offense contains all the elements of murder except that the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability." Robinson, 136 N.J. at 482; see N.J.S.A. 2C:1-8(d)(3). N.J.S.A. 2C:5-1 makes criminal

12                                                        A-5389-15T2

all attempts to commit other crimes defined in the Code, including

passion/provocation manslaughter. Robinson, 136 N.J. at 486.

> In our jurisprudence, attempted passion/provocation manslaughter is comprised of four elements: [1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying.
>
> [State v. Funderburg, 225 N.J. 66, 80 (2016) (citing State v. Mauricio, 117 N.J. 402, 411 (1990)).]

The first two criteria are objective, and the second two are

subjective. Mauricio, 117 N.J. at 411.

"In determining whether to instruct a jury on passion/

provocation manslaughter, the trial judge must view the evidence

in the light most favorable to defendant." State v. Viera, 346

N.J. Super. 198, 212 (App. Div. 2001). As the Supreme Court

explained,

> a trial court in charging a jury sua sponte must find first that the two objective elements of passion/provocation manslaughter are clearly indicated by the evidence. If they are, the two subjective elements should "almost always be left for the jury." That standard is equally applicable to a trial court's decision to charge a jury sua sponte on attempted passion/provocation manslaughter.
>
> [Robinson, 136 N.J. at 491.]

13

The two objective elements are whether the provocation was adequate and whether there was time for the defendant to cool off before the slaying. The measure of adequate provocation is whether "loss of self-control is a reasonable reaction." Mauricio, 117 N.J. at 412. "The 'provocation must be sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control.'" Robinson, 136 N.J. at 491 (quoting Mauricio, 117 N.J. at 412 (alterations in original) (quotations omitted)). "The generally accepted rule is that words alone, no matter how offensive or insulting, do not constitute adequate provocation to reduce murder to manslaughter." Funderburg, 225 N.J. at 80 (quoting State v. Crisantos, 102 N.J 265, 274 (1986)). "[M]utual combat under certain circumstances can constitute adequate provocation to reduce murder to manslaughter, [but] the provocation must be proportionate to the manner of retaliation . . . ." State v. Darrian, 255 N.J. Super. 435, 449 (App. Div. 1992).

As for the cooling-off period, the Supreme Court has said "it is well-nigh impossible to set specific guidelines in temporal terms," therefore "[t]rial courts are . . . remitted to the sense of the situation as disclosed by the facts." Mauricio, 117 N.J. at 413. In Mauricio, the Court found that a half hour was not, as a matter of law, a sufficiently long enough period of time such

14                                                                              A-5389-15T2

that "no jury could rationally determine that a reasonable person's inflamed passions might not have cooled sufficiently to permit the return of self-control." Id. at 415.

Here, the evidence demonstrated that defendant and the victim were engaged in an argument, which included physical violence, before the shooting. However, several witnesses testified that the physical altercation had ended, and defendant and the victim had been separated before defendant shot the victim. In addition, at the time of the shooting, the victim was retreating from the confrontation, was unarmed, and posing no physical threat to defendant. Although defendant and the victim were engaged in a verbal exchange prior to the shooting, as noted above, words alone are never sufficient to justify a passion/provocation manslaughter instruction. These facts certainly do not jump off the page suggesting sufficient provocation to justify a sua sponte charge.

Additionally, the Supreme Court has recognized that attempted passion/provocation manslaughter will "remain unfamiliar, because there are few instances in which a defendant charged with attempted homicide will want to raise before a jury the argument that he or she actually intended to kill." Funderburg, 225 N.J. at 80 (quoting Robinson, 136 N.J at 493). Here, a jury charge on attempted passion/provocation manslaughter, which would require the jury to find that defendant intended to kill the victim, would

have undermined defendant's theory that he was not the shooter. A sua sponte instruction on a charge that contradicts the defendant's theory of the case would have compounded the defense he advanced to the jury, militating against a conclusion of plain error. R.T., 205 N.J. at 513-14 (Long, J., concurring).

2. Jury Instruction on Possession of
   a Firearm for an Unlawful Purpose.

Defendant argues that the court erred in its jury charge on the count alleging possession of a firearm for an unlawful purpose. Defendant argues that the court should have instructed the jury as to the affirmative defense that defendant contended that he never was in possession of a firearm.

The Model Jury Charge for possession of a firearm with a unlawful purpose requires the court to describe the four elements of the crime: (1) that there was a firearm; (2) that defendant possessed the firearm; (3) that defendant possessed the firearm with the purpose to use it against the person or property of another; and (4) that defendant's purpose was to use the firearm unlawfully. Model Jury Charges (Criminal), "Possession Of A Firearm With A Purpose To Use It Unlawfully Against The Person Or Property Of Another (N.J.S.A. 2C:39-4)," (rev. June 16, 2003). The court must also instruct the jury that it is the State's burden

to prove each element beyond a reasonable doubt, and explain what is necessary to meet that burden.  <u>Ibid.</u>

The instruction must include the alleged unlawful purpose because "[a] jury is not qualified to say without guidance which purposes for possessing a gun are unlawful under N.J.S.A. 2C:39-4(a) and which are not."  <u>State v. Jenkins</u>, 234 N.J. Super 311, 316 (App. Div. 1989).  The Model Jury Charge provides a space to state defendant's purported lawful purpose, if one is offered.

Here, at the jury-charge conference, the trial court sua sponte raised with counsel the need to include in the instructions an affirmative defense that defendant never was in possession of a weapon.  The State, although not objecting to including the charge, noted that defendant did not testify and, therefore, did not deny possessing a weapon.  The State argued that including the affirmative defense in the jury instructions would, in effect, permit defendant to testify without being subject to cross-examination.  The trial court decided, without objection from defendant, not to include the affirmative defense instruction.

The court thereafter charged the jury with the model instructions.  The charge, therefore, is presumptively proper. <u>State v. R.B.</u>, 183 N.J. 308, 325 (2005).  Jurors were instructed that possession of a weapon was an essential element of the charge, and that the State had the burden of proving that element, and all

other elements, beyond a reasonable doubt. The instructions had all "essential and fundamental issues and . . . substantially material points," State v. Green, 86 N.J. 281, 290 (1981), providing the jury with "a comprehensible explanation of the questions that [they] must determine . . . ." Id. 287.

We review the court's jury instructions for plain error. We see nothing in the instructions clearly capable of causing an unjust result. The court clearly and repeatedly instructed the jury that in order to convict defendant of the charge they must find beyond a reasonable doubt that he possessed a weapon for an unlawful purpose. Defendant's counsel had an opportunity to cross-examine the witnesses who testified that defendant was in possession of a gun, and to argue in summation that the State had not met its burden of proving the elements of the charge, including defendant's possession of the gun, beyond a reasonable doubt.

3. Jury Charge on Intoxication Defense.

In his pro se brief, defendant argues that the trial court should have sua sponte instructed the jury on voluntary intoxication as a defense because several witnesses testified that defendant was drinking alcohol before the shooting. We disagree.

A conviction of murder requires proof that the defendant acted purposely or knowingly. N.J.S.A. 2C:11-3(a)(1), (2). "To act purposely requires a conscious objective to engage in conduct

or to cause the result of conduct, while to act knowingly requires awareness of the nature of the conduct involved." State v. Sette, 259 N.J. Super. 156, 170 (App. Div. 1992); see N.J.S.A. 2C:2-2b(1), (2). "[W]hen the requisite culpability for a crime is that the person act 'purposely' or 'knowingly,' evidence of voluntary intoxication is admissible to disprove that requisite mental state." State v. Cameron, 104 N.J. 42, 53 (1986). Voluntary intoxication can reduce the offense of purposeful or knowing murder to manslaughter or aggravated manslaughter. State v. Warren, 104 N.J. 571, 577 (1986).

In order for intoxication to diminish "the capacity to act purposely or knowingly, the intoxication must be of an extremely high level; it must have caused a 'prostration of faculties' in the defendant." Sette, 259 N.J. Super. at 170 (quoting Cameron, 104 N.J. at 54). "[A] jury issue arises only if there exists a rational basis for the conclusion that defendant's" intoxication has reached a level where "he or she was incapable of forming an intent to commit the crime." Mauricio, 117 N.J. at 418-19.

Because defendant did not request an intoxication charge, we review his argument on this point for plain error. A review of the record reveals a lack of evidence that defendant was incapable of acting with the requisite intent. While several witnesses testified that defendant was seen drinking alcohol at the party,

no one testified that his faculties were so prostrated that he was incapable of forming a knowing or purposeful intent to kill the victim. Simply put, there was no evidence on which the jury could reasonably have concluded that defendant established a voluntary-intoxication defense to the attempted murder charge.

4.    Admission of the Victim's Redacted
      Recorded Statement to Police.

Defendant challenges the trial court's admission under N.J.R.E. 803 of the audio recording of the victim's statement to police at the hospital. The victim testified that he "probably" was given morphine prior to the hospital interview, but that he remained coherent, and was not drunk when talking to detectives. He acknowledged referring to defendant as his brother-in-law, but denied having told detectives that his brother-in-law shot him.

The State moved to play the audio recording of the victim's statement to police at the hospital. Defendant objected, arguing that the statement was not reliable because the victim was intoxicated and medicated when he made the statement.

N.J.R.E. 803(a) provides, in relevant part,

> The following statements are not excluded by the hearsay rule:
>
> PRIOR STATEMENTS OF WITNESSES. A statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:

20

> (1) is inconsistent with the witness'
> testimony at the trial or hearing and is
> offered in compliance with Rule 613. However,
> when the statement is offered by the party
> calling the witness, it is admissible only if,
> in addition to the foregoing requirements, it
> (A) is contained in a sound recording or in a
> writing made or signed by the witness in
> circumstances establishing its reliability
> . . .; or
>
> . . . .
>
> (3) is a prior identification of a person
> made after perceiving that person if made in
> circumstances precluding unfairness or
> unreliability.

At a hearing to determine the reliability of the statement, Detective Petroski testified that during the interview it appeared that the victim had been drinking and emitted an odor of alcohol. The detective, however, believed that the alcohol was not affecting the victim's coherency, that he was responsive to questions, and appeared to be answering truthfully. Petroski testified that the victim's speech was a little slurred and his eyes were a little glassy. He noted that the victim was focused on his questions, was wide awake, never "faded off," and appeared to be sobering up. The detective's observations were based on his professional experience, including conducting drunk-driving stops, training, and interactions with intoxicated people. Finally, Petroski testified that he ended the interview because he thought the victim

21

was not being completely forthright, given his desire to exact revenge on the shooter.[3]

The trial court found that a redacted version of the victim's recorded police statement would be admissible under both N.J.R.E. 803(a)(1) and (a)(3). The court found that the victim's level of intoxication and medical treatment did not make him incoherent or affect the reliability of his statement to Detective Petroski. In addition, the court found that the victim intentionally did not identify defendant by name because he wanted to exact revenge without involving the police, and that he obstructed the interview in order to encourage the detectives to leave. The court found the victim's behavior was indicative of a control of his faculties.

"Trial judges are entrusted with broad discretion in making evidence rulings." State v. Harris, 209 N.J. 431, 439 (2012). "Trial court evidentiary determinations are subject to limited appellate scrutiny, as they are reviewed under the abuse of discretion standard." State v. Buda, 195 N.J. 278, 294 (2008).

---

[3] A physician who treated the victim testified that the victim did not appear intoxicated because he did not slur his speech, and answered questions appropriately. The physician also testified that a test indicated that the victim's blood alcohol level was 2.5 times the legal limit for drunk driving. He explained, however, that the test results could have been affected by an alcohol wipe of the victim's arm prior to the injection for the test or prior to the insertion of an IV tube. He also testified that he gave the victim Dilaudid, a pain relief medication. The physician testified that Dilaudid does not affect coherency.

We do not substitute our judgment for that of the trial court, unless "the trial court's ruling 'was so wide of the mark that a manifest denial of justice resulted.'" State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)).

N.J.R.E. 803(a)(1) is designed "to limit substantive admissibility of prior inconsistent statements . . . to those statements given in a form and under circumstances importing special reliability." State v. Gross, 121 N.J. 1, 9 (1990) (citations omitted). "Such statements must pass the double hurdle of a . . . hearing on admissibility and in-court cross-examination prior to a finding on sufficiency." State v. Mancine, 124 N.J. 232, 248 (1991). "The determination of the reliability of pretrial statements must take into account all relevant circumstances." State v. Michaels, 136 N.J. 299, 317 (1994). In Gross, the Court detailed the range of factors that might bear on the reliability of a pretrial statement, including the person or persons to whom the statement was made, the manner and form of interrogation, physical and mental condition of the declarant, the use of inducements, threats or bribes, and the inherent believability of the statement. 121 N.J. at 10.

At a reliability hearing, "the court should be convinced by a preponderance of the evidence that the evidence is sufficiently reliable for presentation to the jury . . . ." State v. Brown,

138 N.J. 481, 539 (1994). Additionally, "when a witness testifies at trial inconsistent with a signed or sound-recorded statement, admissible under N.J.R.E. 803(a)(1), the Confrontation Clause is not offended by the reading or playing of the out-of-court statement to the jury provided that the defendant has the opportunity to cross-examine the witness." State v. Cabbell, 207 N.J. 311, 336 (2011).

We cannot say that the trial court abused its discretion when admitting the victim's recorded prior inconsistent statement identifying the shooter. The record contains substantial, credible evidence supporting the trial court's finding that the victim was sufficiently sober, and the circumstances of his interview sufficiently trustworthy, to allow for admission of the audio recording of his statement to police. Moreover, the victim was given an opportunity during his testimony to explain or disavow his prior statement, and defendant had the opportunity to cross-examine the witness, satisfying N.J.R.E. 613(b).

Defendant also argues that the victim's statement could not be deemed a prior identification because he did not identify defendant with specificity. Defendant points out that the victim calls each of his sisters' spouses or boyfriends his "brothers-in-law." Thus, according to defendant, the victim's statement could be interpreted to identify several people as the shooter.

24

The Supreme Court has stated that "[r]eliability is the linchpin in determining the admissibility of identification testimony." State v. Madison, 109 N.J. 223, 232 (1988) (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)). As was the case with the victim's prior inconsistent statement, the circumstances surrounding the victim's identification of his assailant support the trial court's finding of reliability.

An eyewitness need not know or provide the name of an assailant to make a reliable identification. State v. Swed, 255 N.J. Super. 228, 247 (App. Div. 1992) (holding that testimony that defendant resembles a person observed by the witness, is of the same size or general appearance, or has physical features close to accused is sufficient to constitute an identification). Here, the victim's recorded identification of defendant, one of several people the victim called his "brother-in-law," was entered after several eyewitnesses identified defendant as the shooter, corroborating the reliability of the victim's recorded identification. The defendant had an opportunity to cross-examine the victim and argue to the jury that the recorded identification was ambiguous and sufficient to create a reasonable doubt.

5.  Admission of Jonathan's Statement
    to Police.

Defendant challenges the trial court's decision to permit a police report containing a statement Jonathan, the victim's nephew, made to police shortly after the shooting, to be read to the jury. He argues that admission of the statement violated his right to confrontation under the federal and State Constitutions.

At trial, Jonathan testified that while he could identify defendant, he could not remember what he witnessed on July 26, 2012, because of a medical condition. His review of a police report that included the statement he gave to detectives after the shooting did not refresh his memory. He testified that he could not even recall going to the police station, or being interviewed by detectives.

Outside the presence of the jury, Jonathan testified that he receives government benefits for a recognized disability that affects his reading comprehension and long-term memory. The trial court found Jonathan's testimony to be credible, and determined that he genuinely had no recollection of the events of the night in question. The judge, over defendant's objection, found that Jonathan's statement to police, recorded four to six hours after the shooting when the facts, based on his personal observations, were fresh in his mind, was admissible under N.J.R.E. 803(c)(5).

After Jonathan's statement was read to the jury, he was subject to cross-examination. Defendant's counsel's questions emphasized that Jonathan had a medical condition that affected his long-term memory, and that he did not remember anyone being shot on July 26, 2012, or any other details of that night's events, or the interview with detectives in the hours after the shooting.

Both the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution provide that in a criminal trial the accused has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. The Confrontation Clauses prohibit the use of a witness's out-of-court testimonial hearsay statement as a substitute for in-court testimony when a defendant has not been given the opportunity to cross-examine the witness. Cabbell, 207 N.J. at 329; California v. Green, 399 U.S. 149, 158 (1970).

The Sixth Amendment "'places no constraints at all on the use of [a witness's] prior testimonial statements,' provided that 'the [witness] appears for cross-examination at trial.'" State v. Nyhammer, 197 N.J. 383, 412 (2009) (alterations in original) (quoting Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004)). The right to confront witnesses "does not assure that cross-examination will be successful." Cabbell, 207 N.J. at 337 (holding that although a witness's feigned lack of recollection may sharply limit

or nullify the value of cross-examination those limitations do not rise to the level of violating a defendant's right to confrontation). "It is sufficient that the defendant has the opportunity to bring out such matters as the witness's bias, his lack of care and attentiveness, his poor eyesight, and even . . . the very fact that he has a bad memory." United States v. Owens, 484 U.S. 554, 559 (1988).

N.J.R.E. 803(c)(5), entitled "recorded recollection," allows for the admission, despite the hearsay rule, of a

> statement concerning a matter about which the witness is unable to testify fully and accurately because of insufficient present recollection if the statement is contained in a writing or other record which (A) was made at a time when the fact recorded actually occurred or was fresh in the memory of the witness, and (B) was made by the witness or under the witness' direction or by some other person for the purpose of recording the statement at the time it was made, and (C) the statement concerns a matter of which the witness had knowledge when it was made, unless the circumstances indicate that the statement is not trustworthy; provided that when the witness does not remember part or all of the contents of a writing, the portion the witness does not remember may be read into evidence but shall not be introduced as an exhibit over objection.

The trial court's determination that Jonathan genuinely could not recall the events of July 26, 2012, is well supported by the record. It is undisputed that Jonathan has a medical condition,

recognized by the federal government as a disability, that affects his long-term memory. The trial court, having had an opportunity to observe Jonathan and measure his credibility, determined that he sincerely could not recall the shooting, or his subsequent interview by detectives at the police station. The court's determination that Jonathan's statement to police could be read to the jury pursuant to N.J.R.E. 803(c)(5) was sound.

In addition, defendant had the opportunity to cross-examine Jonathan. Defendant's counsel explored his inability to recall what he witnessed on July 26, 2012, or the circumstances of his interview by detectives after the shooting. Those areas of inquiry provided defendant with a basis to challenge the reliability of Jonathan's identification of defendant as the shooter, and allowed the jury to weigh the value of Jonathan's statement. Defendant suffered no constitutional deprivation.

6. <u>Sanitization of Defendant's Prior Convictions at the Certain-Persons Trial.</u>

Defendant argues that the trial court erred by not sanitizing his prior felony convictions at the bifurcated trial on the certain-persons charge. We disagree.

Under N.J.S.A. 2C:39-7(b)(1), a person who has previously been convicted of a specified offense who purchases, owns, possesses, or controls a weapon, has committed a second-degree offense. In

29

order to convict a defendant of this offense, the State must prove beyond a reasonable doubt a prior conviction of at least one statutorily defined predicate offense. Admission of evidence of a conviction of a prior offense creates a potential for prejudice.

Where a defendant stipulates to having been convicted of a predicate offense, "[t]he most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that . . . bar a convict from possessing a gun . . . ." State v. Brown, 180 N.J. 572, 584 (2004) (quoting Old Chief v. United States, 519 U.S. 172, 190-91 (1997)). However, as the Supreme Court recently explained,

> [w]hen a defendant declines to stipulate to a predicate offense, the State is put to its proofs. The trial court's role in such cases is to take steps to "sanitize" the State's evidence to avoid jury prejudice while the State attempts to prove the elements of the certain persons statute to that defendant.
>
> [State v. Bailey, 231 N.J. 474, 477 (2018).]

Before the holding in Bailey, the controlling practice was that in the absence of a stipulation, the trial court would limit the proof to the date and the degree of the predicate offense. Brown, 180 N.J. at 585; Model Jury Charges (Criminal), "Certain Persons Not to Have Any Weapons, N.J.S.A. 2C:39-7(b)(1)" 1 n4 (rev. June 13, 2005). This approach was overturned in Bailey.

In that case, the defendant was charged with several offenses arising from an armed robbery, including unlawful possession of a weapon, possession of a weapon for an unlawful purpose, and a certain-persons offense, based on the defendant's prior convictions of predicate offenses. Bailey, 231 N.J. at 474. The trial was bifurcated, with all charges other than the certain-persons offense being presented to the jury. After the jury convicted the defendant of all charges in the first trial, the certain-persons offense was tried before the same jury. Id. at 478-79.

The defendant would not stipulate to the predicate convictions. As a result, the parties agreed that evidence of his prior convictions would be redacted except for the dates and the degree of the offenses. Id. at 479. After the jury convicted him of the certain-persons offense, the defendant appealed. He argued that the State failed to prove every element of the offense because it offered evidence only that he was convicted of third-degree offenses, and not of third-degree offenses specified as predicate offenses in N.J.S.A. 2C:39-7(a). We affirmed. Id. at 480.

The Supreme Court reversed, holding that the "over-sanitization called for in the model charge injects a constitutional defect into any trial on a certain-persons offense where a defendant declines to stipulate." Id. at 488. This approach "prevents a jury from finding beyond a reasonable doubt a

required element of the certain-persons offense — a clear constitutional infirmity." Id. at 489. To remedy this situation, the court held that "[w]hen a defendant refuses to stipulate to a predicate offense under the certain persons statute, the State shall produce evidence of the predicate offense: the judgment of conviction with the unredacted nature of the offense, the degree of offense, and the date of conviction." Id. at 490-91.

Here, defendant was convicted of two prior drug offenses that qualified as predicate offenses under N.J.S.A. 2C:39-7(a). He did not stipulate to having been convicted of predicate offenses. As a result, the State entered into evidence two certified judgments of conviction. The judgments demonstrated that defendant had been convicted of distribution of cocaine, and possession of a controlled, dangerous substance with intent to distribute.

During the jury charge conference which took place before the trial commenced, defendant requested that the two convictions be referred to only as "predicate offenses," rather than by name. The State did not object to this characterization of defendant's convictions. The trial court agreed to defendant's request. It is clear, however, that this agreement was based on defendant entering into a stipulation regarding his prior convictions. Before the trial commenced, however, defendant's counsel informed the court that defendant would not enter into a stipulation. The

court responded by stating that the previously agreed upon jury instructions would have to be revised.

In the absence of defendant's stipulation, the State was compelled to call a witness to secure the admission of two judgments of conviction. As is required by the holding in Bailey, the witness discussed the nature of the offenses. That information was necessary for the jury to make a determination of whether the State had established an element of the certain-persons charge. Naturally, the State discussed this evidence in its opening statement, as did the trial court when instructing the jury on its need to determine if a predicate offense had been proven beyond a reasonable doubt. Had defendant genuinely believed that he had stipulated to his prior convictions, as he argues in written submissions to this court, his counsel surely would have questioned the need for the jury to hear any testimony or see any evidence regarding the prior convictions, apart from the fact that they had been stipulated to by the parties.

7.   The Police Officer's Testimony
     Regarding the Motel Surveillance Video.

In his pro se brief, defendant, for the first time on appeal, argues that it was impermissible for the police officer who viewed the motel surveillance video to have identified defendant as the man who entered the motel lobby several hours after the shooting.

Defendant argues that the officer lacked personal knowledge of defendant's appearance, rendering his testimony baseless opinion.

N.J.R.E. 701 provides that "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." This rule permits an officer "to set forth what he or she perceived through one or more of the senses . . . [such as] what the officer did and saw . . . ." State v. McLean, 205 N.J. 438, 460 (2011).

We examine the record for plain error. The officer gave a factual recitation of what he observed on the video. He did not identify defendant as the shooter. He, instead, provided factual testimony regarding what he observed, and his lay opinion that the person in the video resembled a composite sketch. The testimony was related to the officer's observations and helpful to explain the investigation that followed the shooting.

8.   The Investigator's Notes.

Defendant argues that the State violated its post-indictment discovery obligations because an investigator destroyed his contemporaneous investigation notes. We disagree.

"Except for good cause shown, the prosecutor's discovery for each defendant named in the indictment shall be delivered to the

criminal division manager's office, or shall be available through the prosecutor's office, upon the return or unsealing of the indictment."   R. 3:13-3.   "Once an indictment has issued, a defendant has a right to automatic and broad discovery of the evidence the State has gathered in support of its charges." State v. Scoles, 214 N.J. 236, 252-53 (2013).

"[L]aw enforcement officers may not destroy contemporaneous notes of interviews and observations at the scene of a crime after producing their final reports."  State v. W.B., 205 N.J. 588, 607 (2011) (citing State v. Branch, 182 N.J. 338, 367 n10 (2005)).  At trial, Detective Petroski testified that he drafted his police report, constituting his contemporaneous notes, in Microsoft Word before copying and pasting the report into an electronic reporting system.  He thereafter deleted the original Word document.  The electronic report, which was supplied to the defense, contained all of the detective's contemporaneous notes.  The State, therefore, complied with Rule 3:13-3.

9.   Defendant's Sentence.

Defendant contends that the trial court improperly relied on his prior convictions to both justify its decision to impose an extended term, and to find aggravating factors at sentencing.

"The court may, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime of the first,

second or third degree to an extended term of imprisonment if it finds one or more of the grounds specified in" N.J.S.A. 2C:44-3. An extended sentence is permitted if "[t]he defendant has been convicted of a crime of the first, second or third degree and is a persistent offender." N.J.S.A. 2C:44-3(a). A "persistent offender" is a person (1) who committed his present crime when he was at least 21 years old, (2) who has been previously convicted of two crimes on at least two separate occasions, (3) committed at different times, (4) when he was at least 18 years old, and (5) the latest in time of these two crimes or the date of defendant's last release from confinement, whichever is later, is within ten years of the date of defendant's present crime. Ibid.

In State v. Dunbar, 108 N.J. 80 (1987), the Court established a multi-step process for imposing an extended sentence.

> First, the sentencing court must determine whether the minimum statutory predicates for subjecting the defendant to an extended term have been met. Second, the court must determine whether to impose an extended sentence. Third, it must weigh the aggravating and mitigating circumstances to determine the base term of the extended sentence. Finally, it must determine whether to impose a period of parole ineligibility.
>
> [Id. at 89.]

Once a court finds the statutory requirements have been met, it may sentence the defendant to a term between the minimum of the

ordinary-term range and the maximum of the extended-term range. State v. Pierce, 188 N.J. 155, 169 (2006).

The judge found that defendant committed the present first-degree attempted murder when he was thirty-eight. Although defendant had at least eleven prior felony convictions, the trial court found him to be extended-term eligible based on three predicate crimes, only two of which, third-degree escape, and third-degree possession with intent to distribute a controlled dangerous substance, both when he was at least 18 years old, are necessary to justify an extended sentence. The latest in time of these convictions and defendant's last release from confinement were within ten years of the present offense.

The court considered defendant's eight other convictions in determining the sentencing range. A court may consider "other aspects of defendant's [prior] record, which are not among the minimal conditions for determining persistent offender status . . . will be relevant factors in adjudicating the base extended term." Dunbar, 108 N.J. at 92. The trial court gave appropriate weight to defendant's history of criminal activity at sentencing.

Defendant also states that the trial court failed to engage in a proper analysis when imposing a consecutive sentence on the certain-persons conviction. He argues that the certain-persons

offense was not predominantly independent of the substantive offenses because they occurred at the same time and place.

"[I]n fashioning consecutive or concurrent sentences under the Code, sentencing courts should be guided by the Code's paramount sentencing goals that punishment fit the crime, not the criminal, and that there be a predictable degree of uniformity in sentencing." State v. Yarbough, 100 N.J. 627, 630 (1985).

In Yarbough, the Court adopted six criteria to be applied when deciding whether to impose consecutive sentences:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.[4]

[Id. at 643-44 (footnotes omitted).]

The Yarbrough factors "should be applied qualitatively, not quantitatively . . . [i]t follows that a sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences." Carey, 168 N.J. 413, 427-28 (2001). "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." State v. Miller, 205 N.J. 109, 129 (2011).

---

[4] The sixth guideline was later superseded by statute. See State v. Carey, 168 N.J. 413, 423 n.1 (2001).

The trial court found that the <u>Yarbough</u> factors supported a concurrent sentence for the unlawful possession of a weapon conviction, and a consecutive sentence for the certain-persons offense. The court found that the consecutive sentence was appropriate based on the clear legislative intent to create two distinct possessory offenses which call for separate punishments. Therefore, the court reasoned, even though there were no additional victims or acts of violence associated with the certain-persons conviction, the possessory offenses targeted separate and independent actions warranting separate punishment.

The record supports the trial court's decision. We see no basis to disturb defendant's sentence.

10. <u>Defendant's Remaining Arguments.</u>

Having reviewed the record and the law in light of defendant's remaining arguments, we conclude that these arguments are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5389-15T2